Slip Op. 20-71

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş.,** | |
| Plaintiff, | **Before: Jane A. Restani, Judge** |
| **AMERICAN CAST IRON PIPE COMPANY,** *et al.*, | **Consol. Court No. 19-00056** |
| Consolidated Plaintiffs, | **PUBLIC VERSION** |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| **AMERICAN CAST IRON PIPE COMPANY,** *et al.*, | |
| Defendant-Intervenors, and | |
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş,** | |
| Consolidated Defendant-Intervenor. | |

## OPINION AND ORDER

[Commerce's Final Results of Redetermination Pursuant to Court Remand are sustained]

Dated: May 22, 2020

Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Edward J. Thomas, III, Eugene Degnan, Jordan L. Fleischer, Sabahat Chaudhary, and Rudi W. Planert, Morris, Manning & Martin L.L.P., of Washington, D.C., for Plaintiff and Consolidated Defendant-Intervenor Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

Timothy C. Brightbill, Maureen E. Thorson, Laura El-Sabaawi, Adam M. Teslik, Elizabeth S. Lee, Enbar Toledano, and Tessa V. Capeloto, Wiley Rein L.L.P., of Washington, D.C., for

Consolidated Plaintiffs and Defendant-Intervenors American Cast Iron Pipe Company, Berg Steel Pipe Corporation, Berg Spiral Pipe Corporation, Dura-Bond Industries, Strupp Corporation, Greens Bayou Pipe Mill LP, JSW Steel (USA) Inc., Skyline Steel, Trinity Products LLC, and Welspun Tubular LLC.

Robert R. Kiepura, Trial Attorney, and L. Misha Preheim, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States of America.  With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C.  Of counsel on the brief was Reza Karamloo, Senior Attorney, Office of the Chief Counsel, Commercial Litigation Branch for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Restani, Judge:  This matter is before the court following a remand to the Department of Commerce ("Commerce") in Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 426 F. Supp. 3d 1395 (CIT 2020) ("Borusan"), in which Plaintiff,  Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("BMB"), challenges a final determination and resulting antidumping duty order as to certain Large Diameter Welded Pipe ("LDWP") from the Republic of Turkey. See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 6,362 (Dep't Commerce Feb. 27, 2019) ("Final Determination"); Large Diameter Welded Pipe from the Republic of Turkey: Amended Final Affirmative Antidumping Duty Determination & Antidumping Duty Order, 84 Fed. Reg. 18,799 (Dep't Commerce May 2, 2019).

In Borusan, the court upheld Commerce's determination that BMB was entitled to a post-sale price adjustment and concluded that Commerce's application of its new arm's-length test to BMB's home-market transactions with its affiliate was not contrary to law.  Borusan, 426 F. Supp. 3d at 1406–10, 1413–14.  The court remanded to Commerce to reconsider (1) the amount of BMB's downward post-sale price adjustment on its home market sales and (2) the date of BMB's U.S. sales, and ordered Commerce to eliminate any adjustment to BMB's sales below the costs of

production based on a finding that a particular market situation ("PMS") exists in the exporting

country.  See id. at 1415.

Following remand, Commerce concluded it did not have additional evidence showing an

improper allocation of the post-sale price adjustment to BMB.  Final Results of Redetermination

Pursuant to Court Remand, ECF No. 86 at 1, 4 (Mar. 9, 2020) ("Remand Results").  Thus,

Commerce, under protest, granted BMB "the full amount of the post-sale price adjustment," which

resulted in a de minimis estimated weighted-average dumping margin.  Id. at 1, 4.  Accordingly,

Commerce did not address BMB's U.S. date of sale or sales-below-cost because doing so would

be an exercise in futility.  Id. at 4.  The Remand Results adequately address the court's concerns

in Borusan and they are supported by substantial evidence.  Accordingly, the Remand Results are

sustained.

## BACKGROUND

While the court presumes familiarity with the record in Borusan, the court briefly

summarizes the relevant record evidence for ease of reference.  The period of investigation covers

January 1 through December 31, 2017.  See Final Determination, 84 Fed. Reg. at 6,362.  In Autumn

2013, BMB and two other Turkish LDWP producers (the "Consortium Members") formed a

general partnership (the "Consortium").  See   BMB's Resp. to Commerce's Suppl. Sections A-C

Questionnaire, C.R. 200-225, P R. 173-174 (June 15, 2018), ECF No. 100 at 38–45 (May 5, 2020).

(the "2013 Joint Venture Agreement").  The 2013 Joint Venture Agreement recognizes joint and

several liability among the Consortium Members as to the Consortium's liabilities to third-parties,

and goes on to create an irrevocable guaranty arrangement between the Consortium and the

Consortium Members.[1]

---

[1] The guaranty arrangement provides that "[[

In Spring 2014, in advance of submitting their bid for a domestic pipeline project, the

Consortium Members concluded a second written agreement in which they re-affirmed their

individual obligations to the Consortium in view of the specific project's requirements.  See BMB's

Resp. to Commerce's Suppl. Sections A-C Questionnaire, C.R. 200-225, P R. 173-174 (June 15,

2018), ECF No. 100 at 47–48 (May 5, 2020) ("2014 Consortium Agreement").  Specifically, the

2014 Consortium Agreement reiterates the Consortium Members' joint and several liability as to

the Client and provides that should any Consortium Member fail to fulfill its obligations to the

Client, the other two Members would indemnify those obligations.  Id. at ¶ 2.  The Consortium

won the bid and, in Autumn 2014, agreed to sell certain quantities of LDWP to the Client.  See

BMB's Suppl. Resp. to Commerce's Second Suppl. Questionnaire, CR. 280-288, P.R. 180, Ex. B-

32 (July 6, 2018), ECF No. 100 at 60–199 (May 5, 2020) (the "Sales Contract").  As a condition

precedent to the Client's performance, the Consortium was required to provide the Client a written

guaranty agreement demonstrating that each Consortium Member indemnifies the others'

obligations as to the Client.  See id. at 99, ¶ 6.4.[2]

_____

]], providing furthermore that each Consortium Member "[[

]]" including any [[

]]2013 Joint Venture Agreement, at 39, ¶ 6(2) (emphases added).

The court's previous opinion seems to state that an agreement containing this exact language was
presented to the Client; it appears that there is no evidence to that effect.  Commerce did not
comment on this point now raised by Domestic Producers.
[2] Compare Sales Contract at 99, ¶ 6.4 [[                                    ]] with id. at 70, ¶ 1.2- [[
                                                                                                        ]].

In June 2018, pursuant to the <u>2014 Consortium Agreement</u>, BMB negotiated a settlement with the Client on behalf of the Consortium for [[        ]], the whole of which was invoiced to BMB, as leader of the Consortium, "on behalf of" the Consortium for the contractual late delivery penalties incurred in 2017.  <u>See</u> BMB's Resp. to Commerce's Suppl. Questionnaire, C.R. 200-225, P.R. 173-174, Ex. B-28 (June 15, 2018), ECF No. 65-1 at 144 (Oct. 30, 2019).  The Consortium Members agreed, pursuant to the <u>2014 Consortium Agreement</u>, that BMB's liability as to the other Consortium Members was [[          ]], the same amount for which it seeks a post-sale price adjustment.  <u>See</u> BMB's Resp. to Commerce's Suppl. Questionnaire, C.R. 200-225, P.R. 173-174, Ex. B-28 (June 15, 2018), ECF No. 65-1 at 147–153 (Oct. 30, 2019) ("<u>2018 Consortium Protocol</u>").  Nevertheless, in the <u>Final Determination</u>, Commerce allocated the penalty equally among the Consortium Members, and BMB sought review here.  <u>See</u> <u>Borusan</u>, 426 F. Supp. 3d at 1404–05.

Accordingly, the court sustained Commerce's determination that BMB is entitled to a downward post-sale price adjustment for the foregoing home-market sales expenses, in view of 19 C.F.R. §§ 351.102(b)(38) and 351.401(c) (2018).[3]  <u>See</u> <u>id.</u> at 1406–10, 1406 n.11.  Nevertheless, the court remanded to Commerce to reconsider whether the foregoing documents or any other "evidence not previously cited" establishes that BMB "was liable for and actually paid or was credited" a sum less than the full amount that BMB seeks in its adjustment.  <u>See</u> <u>id.</u> at 1410.

---

[3] All further citations to the Code of Federal Regulations are to the 2018 version, unless otherwise indicated.

## JURISDICTION & STANDARD OF REVIEW

The court's jurisdiction continues pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. §

1581(c) (2018).[4]   The court sustains Commerce's final redetermination results unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"

19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also

reviewed for compliance with the court's remand order."  U.S. Steel Corp. v. United States, 219

F. Supp. 3d 1300, 1307 (CIT 2017) (internal quotations and citations omitted).

## DISCUSSION

### I.)      Post-Sale Price Adjustment to Normal Value Determination

In Borusan, notwithstanding the statutory definition of "normal value," the court deferred

to Commerce's interpretation of its regulations, concluding that Commerce may disregard certain

home market sales adjustments "'on a case-by-case basis and in the light of the evidence and

arguments on each record'" when determining whether, and to what extent, a respondent is entitled

to a post-sale price adjustment to normal value.  Borusan 426 F. Supp. 3d at 1406 (quoting

Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81

Fed. Reg. 15,641, 15,645 (Dep't Commerce Mar. 24, 2016) ("Final Modification")).  In view of

Commerce's decision to grant BMB a partial post-sale price adjustment,[5] the court reasoned that

BMB had established its entitlement to an adjustment to Commerce's satisfaction.  See id. at 1407–

09.  The problem seen by the court was that there was no substantial evidence to support equal

allocation of the adjustment among the Consortium Members.  See id. 1409.  Accordingly, the

court remanded to Commerce "to review the penalty documents" or "evidence not previously

---

[4] All further citations to the United States Code are to the 2018 edition, unless otherwise indicated.

[5] See Final Determination, 84 Fed. Reg. at 6,362.

cited" to determine whether BMB met its burden as to its claimed adjustment. Id. at 1410. The

court did not "specifically reject[]" any methodologies, although Commerce was not incorrect that

without more evidence or a new explanation, the court would reject equal allocation. See Remand

Results at 7.

Having found no new evidence to support the equal allocation, Commerce granted BMB

"the full amount of the post-sale price adjustment" under protest because it is "unable to cite such

evidence" supporting an alternative calculation. Id. Defendant, the United States of America (the

"government"), contends that Commerce "analyzed record information to assess the calculation of

the post-sale adjustment" and, after reconsidering the evidence, "redetermined the post-sale

adjustment to reflect the post-sale price adjustment" that BMB claimed during the investigation.

Def.'s Resp. to Cmts. on the Remand Redetermination, ECF No. 98, at 3 (Apr. 22, 2020) ("Gov.

Reply"). The government avers that Commerce's redetermination is reasonable and supported by

substantial evidence. Id. at 6–7.

For their part, the Defendant-Intervenors, American Cast Iron Pipe Company, et al. (the

"Domestic Producers"), maintain that (1) BMB is not entitled to any post-sale price adjustment,

(2) Commerce should have applied an adverse inference based upon facts otherwise available

("AFA") in view of BMB's alleged noncooperation with Commerce, and (3) record evidence does

not support BMB's penalty calculation because the Client was not aware of the guaranty

arrangement at the time of sale. See Def.-Intervenors' Cmts. on Remand Determination, ECF No.

93 at 6–16 (Apr. 8, 2020) ("Dom. Prod. Br.").[6]   The Domestic Producers contend that the court's

---

[6] The court has already concluded that Commerce's determinations to grant BMB a post-sale price
adjustment and not to apply AFA are supported by substantial evidence and not contrary to law.
See Borusan, 426 F. Supp. 3d at 1404 n.7. On remand, the Domestic Producers do not point to
any additional evidence in the record to demonstrate that these determinations were improper. Nor

description of the penalty documents in <u>Borusan</u> was incomplete.  Dom. Prod. Br. at 6.  In their

view, a party is entitled to a post-sale price adjustment only if "the terms and conditions of the

adjustment were established <u>and</u> known to the customer at the time of sale."  <u>Id.</u> at 6–7 (emphasis

added).  They say that <u>Appendix L</u> to the <u>Sales Contract</u> is merely a summary of BMB's guaranty

arrangement with the Consortium, so that the Client was unaware of the Consortium Members'

"agreement to mutually reimburse one another for penalties incurred by the [C]onsortium as a

whole [[                                                    ]]."  <u>Id.</u> at 10.  Additionally, the Domestic Producers claim

that substantial evidence does not support BMB's methodology for calculating its claimed post-

sale price adjustment.  <u>Id.</u> at 14–16.  Finally, they contend that even if BMB is entitled to a post-

sale price adjustment and even if Commerce's calculation methodology is permissible, substantial

evidence supports only an amount equal to "one-third of the total penalty amount called for under

the original contract terms."  <u>Id.</u> at 13.  The Domestic Producers are incorrect on each score.

 First, the <u>Final Modification</u> factors are "non-exhaustive," and "Commerce weighs [them]

singly or in combination."  <u>China Steel Corp. v. United States</u>, 393 F. Supp. 3d 1322, 1347 (CIT

2019) (citing <u>Final Modification</u>, 81 Fed. Reg. at 15,644–45).  The knowledge factor tests

"[w]hether the terms and conditions of the adjustment were <u>established and/or known</u> to the

customer at the time of sale, and whether this can be demonstrated through documentation."  <u>Final</u>

<u>Modification</u>, 81 Fed. Reg. at  15,644–45 (emphasis added).  Commerce has at times required

"proof that buyers were aware of the conditions to be fulfilled and the approximate amount of the

rebates at the time of sale."  <u>China Steel</u>, 393 F. Supp. 3d at 1347 (internal quotation and citation

omitted).  Each of these requirements is met here.  <u>Appendix L</u> to the <u>Sales Contract</u> and the <u>2014</u>

---

did they do so before Commerce.  <u>See</u> <u>Remand Results</u> at 7.  Accordingly, the court rejects these
arguments at the outset.

Consortium Agreement are identical, and each provides that BMB may indemnify the other

Consortium Members for any liabilities that accrue to the Client under the Sales Contract.

Compare Sales Contract, App'x L, at 183–84 with 2014 Consortium Agreement at 47–48.  Further,

as the Domestic Producers acknowledge, the Sales Contract sets the per diem late delivery penalty

rate to a figure certain.  See Dom. Prod. Br. at 12 (citing Sales Contract at 103–04, ¶ 8.2.1).  The

Sales Contract also establishes the per diem late delivery penalty rates.  See Sales Contract at 105,

¶ 9.1.  Accordingly, the Client necessarily knew, at a time of sale predating the period of

investigation, of BMB's guaranty arrangement with the Consortium, the general terms and

conditions of that arrangement, and the approximate sum for which BMB could be liable to the

Client on behalf of the Consortium pursuant to the Sales Contract.  Likewise, the terms and

conditions of the guaranty necessarily were "established" at the time of sale, even if the Client did

not receive a copy of the contract whereby all of the duties of the Members of the Consortium to

each other were set forth.[7]

Given the guaranty arrangement, it would not be important to the Client which party would

ultimately bear the loss.  They were all on the hook for any penalties owed to it.  What should be

important is that the principles and terms of the allocation were contractually set between the

Consortium Members prior to the investigation at issue.  Although the court does not substitute its

own view of the record, Commerce "'must reasonably tie the determination'" to the facts upon

which it is relying.  Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1334 (CIT 2019)

---

[7] No party, including the Domestic Producers, asked the court to reconsider its remand opinion on
this point or to amend its remand instructions prior to completion of the remand.  It is simply too
late to raise this point.  If the factual discrepancy described supra note 1 were material, the court
even now would reconsider broadening the remand instructions, but it is not.  All relevant terms
were established and the obligation for the penalty was clearly part of the Sales Contract with the
Client, as Commerce so found.

(quoting <u>CS Wind Viet. Co., Ltd. v. United States</u>, 832 F.3d 1367, 1376 (Fed. Cir. 2016)).  The

record evidence shows that each Consortium Member was responsible for its own late deliveries

relating to its sales.  <u>See</u> Documentation from BMB's Second Suppl. Sections A-C Questionnaire,

C.R. 280-288, P.R. 190, Ex. B-32 (July 6, 2018), ECF No. 100 at 201–22, 243–56 (May 5, 2020)

("<u>Late Penalty Settlement Documents</u>").  No Member's responsibility was set at one-third of the

total penalty amount.  <u>See</u> <u>id.</u>; <u>see also</u> 2018 Consortium Protocol.  A primary concern with post-

sale price adjustments is the "potential to manipulate the dumping margins."  <u>See</u> <u>Final</u>

<u>Modification</u>, 81 Fed. Reg. at 15,645.  Neither Commerce nor the Defendant-Intervenors point to

any evidence of suspected or actual manipulation, and the court finds none in the record.  The

Client had full knowledge of the penalty obligations of the full Consortium; the Client's knowledge

at the time of sale of the precise allocation method among the Consortium Members is immaterial

to the instant case.  It is as incorrect to credit BMB with one-third of the post-sale price adjustment

as it would be to credit it with the entire penalty amount that it did not ultimately pay.

Second, the Domestic Producers contend that Commerce's calculation methodology is

incorrect because the total "penalty amount simply does not reflect the contract terms in place at

the time of sale."  Dom. Prod. Br. at 12.  Conceding that the <u>Sales Contract</u> establishes [[

                                                       ]] the Domestic Producers insist that Commerce

should have calculated the Consortium's per diem delay penalty rate pursuant to the penalty clause

in the <u>Sales Contract</u>.  <u>See</u> <u>id.</u> at 11–12.  Although Commerce verified the final penalty amount

that the Consortium actually paid to the Client, the Domestic Producers appear to argue that

Commerce should determine whether the final penalty amount accords with the <u>Sales Contract</u>,

irrespective of the verified amount actually paid.  <u>See</u> <u>id.</u> at 12–13.  In their view, the total late

delivery penalty amount pursuant to the <u>Sales Contract</u> is simply [[                    ]] the product of

the number of delay days for each unit and the price of each unit.  Id. at 12.  This argument lacks

merit.  The adjustment pursuant to the text of the Sales Contract is a percentage of [[

]] per diem, where [[




]].  Sales Contract, at 71 ¶ 1.2, 104 ¶ 8.2.1.  Commerce "independently verified,"

and the record supports, that BMB's payment of [[                    ]] was pursuant to an obligation

specified by these provisions of the Sales Contract.  See Borusan, 426 F. Supp. 3d at 1409.

Where Commerce operates within the bounds of the statute, reasonably interprets its own

regulations, and makes decisions based upon substantial evidence, it "is afforded great latitude in

the choice of methodology to be employed in antidumping investigations."  Timken Co. v. United

States, 930 F. Supp. 621, 630 (CIT 1996) (internal quotation and citations omitted).  There does

not appear to be a real challenge to methodology.  Rather, the question is one of substantial

evidence supporting the adjustment.  When making post-sale price adjustments to normal value

based on price, the question is whether the claimed adjustment is "reasonably attributable to the

subject merchandise or the foreign like product."  19 C.F.R. § 351.401(c).  In this case,

Commerce's determination that BMB's claimed amount is "reasonably attributable" to the foreign

like product and that the penalty results from and bears a direct relationship to a home-market sale

is thus supported by substantial evidence.  Accordingly, the court sustains Commerce's decision

to use verified information in the record to ascertain the sum of the claimed post-sale price

adjustment pursuant to a contract that predates the period of investigation.

Third, because substantial evidence supports Commerce's determination that BMB is entitled to the full amount that it claims, the Domestic Producers' final argument as to whether substantial evidence supports equal allocation among the Consortium Members necessarily fails. See Dom. Prod. Br. at 13. In sum, substantial evidence supports Commerce's determination that BMB is entitled to a post-sale price adjustment in the amount of [[          ]], because this is the sum for which BMB was liable to the Consortium Members vis-à-vis the Consortium's joint liability to the Client. See 2018 Consortium Protocol, at 284, ¶ 3.2 (amount of BMB's liability to Consortium pursuant to the Settlement Agreement); see also Late Penalty Settlement Documents, at 201–22, 245–56 (amount of Consortium's liability to Client).[8] Accordingly, because neither the Domestic Producers nor the government cite any record evidence to show that BMB manipulated or otherwise allocated the penalty amount improperly, Commerce's remand determination granting the full amount of BMB's post-sale price adjustment is sustained.

## II.)   U.S. Date of Sale & PMS Adjustment to Costs of Production Determinations

BMB contends that Commerce's failure to address the remaining issues on remand renders the Remand Results contrary to the court's order in Borusan, and thus constitutes a waiver of BMB's challenge to those issues, and so it seeks judgment as a matter of law on the respective counts in its complaint. See Pl.'s Cmts. on the U.S. Dep't of Commerce's Mar. 9, 2020 Final Redetermination Pursuant to Ct. Remand, ECF No. 88 at 2–5 (Mar. 26, 2020) ("BMB Br."). The government replies that Commerce's decision not to expend resources "to reach the additional

---

[8] The record also contains invoices and documentation of bank transfers. See Documentation from BMB's Second Suppl. Section A-C Questionnaire, C.R. 280-288, P.R. 190, Ex. B-32 (July 6, 2018), ECF No. 100 at 328–38 (May 5, 2020). The bank transfers show that in July 2018, BMB remitted a total sum of [[          ]] to the Client. See id. at 333–38.

issues that would have no effect" on the outcome was reasonable under these circumstances, and should be sustained.  Gov. Reply 8–9.

By Commerce's determination that a properly-calculated post-sale price adjustment renders BMB's estimated weighted-average dumping margin <u>de</u> <u>minimis</u>, BMB has secured the maximum possible relief to which it may be entitled under 19 U.S.C. § 1516a – namely, pursuant to 19 U.S.C. § 1673d(a)(4), its merchandise "will be excluded from the underlying antidumping duty order."  <u>Remand Results</u> at 11.  Thus, the correctness of Commerce's determinations as to BMB's U.S. date of sale and its costs of production no longer present a live dispute between BMB and the government.  <u>See</u> <u>Pro-Team Coil Nail Enter., v. United States</u>, 419 F. Supp. 3d 1319, 1340 (CIT 2019) (citing <u>Camreta v. Greene</u>, 563 U.S. 692, 717 (2011)).  Because the Domestic Producers do not challenge Commerce's failure to reconsider either of these issues on remand, there is no actual controversy between the three parties on these two issues at this stage of the proceedings.  <u>See</u> <u>Gerdau Ameristeel Corp. v. United States</u>, 519 F.3d 1336, 1340 (Fed. Cir. 2008) (quoting <u>Hall v. Beals</u>, 396 U.S. 45, 48 (1969)) (further judicial inquiry into non-live issues risks rendering impermissible "'advisory opinions on abstract propositions of law.'").  Commerce was instructed to reexamine the whole record to determine whether substantial evidence supports the <u>Final Determination</u>, and Commerce did so reasonably.  The court's objective is not to impose needless expenses or to waste an agency's time.  <u>See</u> <u>Roses Inc. v. United States</u>, 774 F. Supp. 1376, 1380–81 (CIT 1991).  Commerce was not incorrect in assuming the court did not require useless acts.  Accordingly, Commerce's <u>Remand Results</u> are sustained in full.

### III.)   <u>"All-Others Rate" Determination</u>

Commerce also has determined that because BMB's revised estimated weighted-average dumping margin is <u>de</u> <u>minimis</u>, the all-others rate has changed.  <u>See</u> <u>Remand Results</u> at 11.  The

Domestic Producers contend that because the all-others rate is not at issue and was not subject to the court's remand order, Commerce's adjustment of that rate was improper.  <u>See</u> Dom. Prod. Br. at 16.  BMB does not challenge Commerce's adjustment to the all-others rate.  Pursuant to 19 U.S.C. § 1673d(c)(5)(A), Commerce may set the all-others rate when a "mandatory respondent['s] rate[] change[s] in the course of judicial review, even when the plaintiff does not raise a challenge to the all-others rate in its complaint or during remand proceedings." <u>U.S. Steel Corp. v. United States</u>, 348 F. Supp. 3d 1248, 1254 (CIT 2018).  Accordingly, Commerce's adjustment to the all-others rate during remand proceedings was not contrary to law and will be sustained.

**CONCLUSION**

For the foregoing reasons, the <u>Remand Results</u> are **SUSTAINED**.  Judgment will issue accordingly.

_____/s/ Jane A. Restani_____<br>
Jane A. Restani, Judge

Dated: May 22, 2020
      New York, New York